564 A.2d 919

NEW YORK STATE ELECTRIC & GAS
CORPORATION, Appellant,

v.

WESTINGHOUSE ELECTRIC CORPORATION and Shields
Rubber Corporation, a Pennsylvania Corporation.

Superior Court of Pennsylvania.

Argued Feb. 27, 1989.

Filed Sept. 14, 1989.

Carl A. Eck, Pittsburgh, for appellant.

Paul A. Manion, Pittsburgh, for Westinghouse, appellee.

Before CIRILLO, President Judge, and CAVANAUGH, BROSKY, McEWEN, OLSZEWSKI, BECK, TAMILIA, POPOVICH and JOHNSON, JJ.

BECK, Judge:

This case arises out of a dispute between plaintiff-appellant New York State Electric & Gas Corporation ("NYSEG") and defendant-appellee Westinghouse Electric Corporation ("Westinghouse") concerning alleged defects in a turbine generator designed, manufactured and supplied by Westinghouse to NYSEG for installation in NYSEG's Homer City Electric Generating Station.[1] The trial court granted summary judgment in favor of Westinghouse on alternative grounds; first, that the parties' contracts barred recovery by NYSEG on any of the theories pleaded, and second, that NYSEG's tort causes of action sought recovery of purely economic losses, which are not recoverable in a tort product liability action. We affirm.

## The Contracts

In 1969, Westinghouse supplied NYSEG with two turbine generators for installation in the Homer City Station. Only one of these generators, Unit No. 1, is involved in this case.

---

1. The Homer City Electric Generating Station is actually jointly owned by NYSEG and Pennsylvania Electric Company ("PENELEC") as tenants in common. PENELEC is not a party to this action.

Unit No. 1 functioned without incident until 1983, when the events giving rise to this lawsuit began.

During the years following installation of Unit No. 1, the parties entered into a series of agreements governing Westinghouse's further involvement in servicing the generator and providing materials to the Homer City Station. These agreements consist of a maze of general provisions, blanket purchase orders and more specific purchase orders relating to particular jobs performed by Westinghouse at the Station. They were executed over the five year period from 1979 to 1984. Since the parties' agreements are the horizon against which we must analyze the instant dispute, and are, in our view, determinative of their respective rights and liabilities, we set forth the following detailed description of the agreements' pertinent provisions.

In 1979, ten years after Unit No. 1 became operational, NYSEG and Westinghouse entered into an agreement called the Fixed Price Supply Contract (the "Contract"). As described by NYSEG in the Amended Complaint, this document governed services to be provided by Westinghouse and materials to be supplied by Westinghouse to the Homer City Station from the date of its execution forward. In its initial general provisions, the Contract provides that it is the entire agreement between the parties, presumably as to the subject matter thereof.

The Contract contains very limited warranties regarding Westinghouse's work at the Station. Westinghouse warranted only that its personnel would exercise their best professional knowledge and judgment in performing services and that work or materials supplied under the Contract would conform to contract specifications, be free of defects in workmanship and material and reflect Westinghouse's best technical knowledge and judgment. In the event that either services provided or materials sold were defective, Westinghouse agreed only to reperform, repair, replace or modify the defective services or materials.

The agreements also contain the following pertinent language regarding the extent of Westinghouse's liability to

the owners of the Homer City station, including NYSEG, for either defective materials or services:

Warranties are Exclusive

THE ABOVE WARRANTIES ARE EXCLUSIVE AND ARE IN LIEU OF ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR PURPOSE OR OTHER WARRANTIES OR GUARANTEES OF ANY KIND OR DESCRIPTION, EXPRESS OR IMPLIED

The above warranties do not cover, and Westinghouse will have no responsibility for any failure to meet, any warranty caused by any failure of Purchaser or its agents to store, install, operate, inspect or maintain the equipment covered by this contract in accordance with the recommendations of Westinghouse or in the absence of such recommendations, in accordance with the generally accepted practices of the United States electric power industry, including but not limited to applicable quality assurance procedures relating to the installation of equipment covered by this contract.

Remedies are Exclusive

THE REMEDIES OF PURCHASER SET FORTH FOR THE ABOVE WARRANTIES ARE EXCLUSIVE.

Repair, adjustment, reperformance, modification or replacement of any equipment or services performed hereunder in the manner and during the period provided herein shall constitute fulfillment of all liabilities of Westinghouse to Purchaser under the warranties set forth in this Article, whether based on contract; on negligence of any kind, strict liability or tort, on the part of Westinghouse or of its suppliers or subcontractors of any tier; or otherwise.

Limitation of Liability

PURCHASER EXPRESSLY AGREES THAT, NOTWITHSTANDING ANY OTHER PROVISION OF THIS CONTRACT, UNDER NO CIRCUMSTANCES SHALL WESTINGHOUSE'S TOTAL AGGREGATE LIABILITY RESULTING:

a. FROM THE PERFORMANCE, FAILURE TO PERFORM OR BREACH OF WESTINGHOUSE'S OBLIGATION HEREIN; AND

b. FROM ANY ACTIVITY UNDERTAKEN BY WESTINGHOUSE WITH RESPECT TO THE EQUIPMENT AND SERVICES COVERED BY THIS CONTRACT; AND

c. FROM ALL ACTIONS BASED ON NEGLIGENCE OR ANY KIND, STRICT LIABILITY OR TORT, ON THE PART OF WESTINGHOUSE OR ITS SUPPLIERS OR SUBCONTRACTORS OR ANY TIER; AND

d. OTHERWISE

EXCEED THE PRICE OF THE PRODUCT OR PART ON WHICH SUCH LIABILITY IS BASED.

PURCHASER EXPRESSLY AGREES THAT THE REMEDIES PROVIDED HEREIN RELATING TO WARRANTIES AND PATENT INFRINGEMENT ARE EXCLUSIVE AND THAT NEITHER WESTINGHOUSE NOR ITS SUPPLIERS OR OR SUBCONTRACTORS OF ANY TIER WILL UNDER ANY CIRCUMSTANCES BE LIABLE UNDER ANY THEORY OR [sic] RECOVERY, WHETHER BASED ON CONTRACT, ON NEGLIGENCE OF ANY KIND, STRICT LIABILITY OR TORT, ON THE PART OF WESTINGHOUSE OR ITS SUPPLIERS OR SUBCONTRACTORS OF ANY TIER; OR OTHERWISE, FOR DAMAGE TO OR LOSS OF PROPERTY OR EQUIPMENT OTHER THAN THE EQUIPMENT SUPPLIED HEREUNDER; FOR LOSS OF PROFITS OR REVENUE; FOR LOSS OF USE OF POWER SYSTEM; FOR INCREASED COST OF ANY KIND, INCLUDING BUT NOT LIMITED TO CAPITAL COST, FUEL COST AND COST OF PURCHASED OR REPLACEMENT POWER; CLAIMS OF CUSTOMERS OR PURCHASER, INCLUDING BUT NOT LIMITED TO CLAIMS FOR SERVICE INTERRUPTIONS; OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES.

The parties later executed another general agreement called the Blanket Purchase Order, effective May 1, 1983 through April 30, 1984, pursuant to which Westinghouse agreed to provide engineering services to NYSEG during repairs to the Homer City Station turbine and generators. All services performed by Westinghouse at the Homer City Station in the period covered by the Blanket Purchase Order were provided pursuant to its terms, unless the parties executed another specific purchase order governing the particular job involved. The Blanket Purchase Order incorporated the Contract, with some revisions to the warranty, exclusive remedy and limitation of liability language. However, these revisions did not change the basic parameters of Westinghouse's potential liability. Westinghouse continued to warrant only that the engineering services to be provided would reflect Westinghouse's engineers' best professional knowledge and judgment and, if defective, would be reperformed or the price therefor would be refunded. The exclusive warranty and remedies provisions again expressly limited Westinghouse's warranties and remedies to those stated above. The limitation of liability provision expressly excluded liability in contract or tort for any special, indirect, incidental or consequential damages, including lost profits and cost of replacement energy, and established the price of the defective work or materials as the upper limit of Westinghouse's potential liability. The Blanket Purchase Order also states that is it the entire agreement between the parties, supercedes all prior or contemporaneous representations, and "has been induced by no representations, statements or agreements other than those herein expressed."

Against the backdrop of these agreements, freely negotiated between commercial enterprises, we now turn to the facts of this dispute.

### Factual Background

In December 1983, Westinghouse notified NYSEG that a portion of the turbine generator called the "blower spacer" should be inspected during the next scheduled shut down of

the generator and that during the shutdown, the seal on the blower spacer should be replaced. The generator had last been inspected in November 1983, at which time no problems with the blower spacer had been detected. The December 1983 notification apparently arose from Westinghouse's concern that certain difficulties that had arisen in blower spacers in other generators of the same design as the Homer City generator might have been caused by problems with the seal.

In January 1984, the generator was shut down and a new seal was installed on the blower spacer as Westinghouse had earlier recommended. The materials necessary for this work were provided pursuant to a specific purchase order issued on behalf of NYSEG to Westinghouse. This purchase order incorporated by reference the Contract, including its limitation of liability and exclusive warranties and remedies language. Westinghouse also supervised the replacement process. Since there was no specific purchase order regarding the services Westinghouse supplied, these services were apparently provided pursuant to the Blanket Purchase Order, including its limitation of liability and exclusive warranties and remedies language.

In April 1984, Westinghouse notified NYSEG that the generator should be shut down immediately for reinspection of the blower spacer. NYSEG complied and after reinspection by Westinghouse, Westinghouse concluded that there was an "indication" on the blower spacer of a possible inception of an early stage crack in the blower spacer flange. NYSEG then agreed that the generator should be taken out of service in order to permit Westinghouse to repair the blower spacer, which was accomplished by July 6, 1984. Again, Westinghouse's work on the generator was done pursuant to a specific purchase order that incorporated all of the standing terms and conditions regarding warranties and limitations of liability set forth above.

### Procedural History

NYSEG instituted suit against Westinghouse in June 1986. NYSEG sought recovery of the cost of the repairs

performed between January and July 1984, as well as recovery of lost profits and the cost of purchasing replacement energy to serve NYSEG's customers during the period from April to July 1984 when the generator was out of service because of the repairs. The alleged damages total well in excess of eight million dollars. Because the original complaint did not have copies of the parties' contracts affixed, Westinghouse filed preliminary objections. NYSEG withdrew the complaint and substituted an amended complaint with copies of the relevant contracts and certain other revisions. The amended complaint contained ten counts, as follows:

Count I General Negligence

Count II Willful, Wanton Negligence

Count III Negligent and/or Intentional Misrepresentation

Count IV Negligence—Repair or Inspection

Count V Negligent Performing or Undertaking to Perform Services

Count VI Negligent Sale, Design and Manufacture of Replacement Seal

Count VII Interference with Contractual Relationship

Count VIII Breach of Contract

Count IX Breach of Warranty

Count X Strict Liability

The gravamen of NYSEG's amended complaint was that Westinghouse was negligent in dealing with the Unit No. 1 generator problem. These contentions aimed primarily at two of Westinghouse's actions. First, NYSEG contended that the replacement seal provided in January 1984 was made of different materials from the former seal and that the different seal was defective and may have caused the damage to the blower spacer that was repaired in April to July 1984. Alternatively, NYSEG contended that there never really was any damage to the blower spacer that needed repairing in April 1984 and that Westinghouse made NYSEG take Unit No. 1 out of service unnecessarily, causing NYSEG millions of dollars in unnecessary expense. NYSEG also contended that throughout the period from

December 1983 to July 1984, Westinghouse did not sufficiently understand what or whether problems existed with the generator and that this lack of professional competence resulted in damage to NYSEG. Finally, NYSEG alleged that Westinghouse made certain "negligent and/or intentional misrepresentations" concerning the necessity for the repairs to Unit No. 1 in the spring of 1984 and the nature of the replacement seal provided in January 1984. It alleged that Westinghouse's motive for the alleged misrepresentations as to the need to repair Unit No. 1 in the spring of 1984 was that it needed to obtain a generator to enable it to conduct thorough inspections and tests on it to find out why generators of the same type at other electric generating stations were malfunctioning.

NYSEG did not contend that the generator was defective after the repairs in April–July 1984 had been performed. However, NYSEG did allege that Westinghouse orally represented that these repairs would be complete by June 10, 1984. In fact, Unit No. 1 was not returned to NYSEG until July 6, 1984. NYSEG alleged that this was an inordinate delay resulting from Westinghouse's negligence in performing the repairs, was a misrepresentation and constitutes a breach of contract.[2]

2. We note that the amended complaint does contain two summary allegations relating not to the conduct of Westinghouse in the period from late 1983 to July 1984, but rather to Westinghouse's original sale of the generator to NYSEG in 1965. In Counts IX and X, NYSEG alleges that the blower spacer as originally sold was defective, thus resulting in a breach of warranty and strict liability in tort. Despite the fact that none of the parties' agreements discussed in text above relate to the original sale of the equipment, the trial court made no reference to this aspect of NYSEG's amended complaint and did not distinguish between those contentions that related to the original sale of the generator and those that related to services and materials provided by Westinghouse in 1983–1984. However, NYSEG makes no mention of the allegations relating to the original sale of the equipment in its Statement of Questions on Appeal nor in any other section of its brief to this court. Thus, we find that any issues relating to the propriety of summary judgment against NYSEG on its claims arising from the original sale of the equipment have been waived. Pa.R.A.P. 2116; *Rago v. Nace,* 313 Pa.Super. 575, 460 A.2d 337 (1983). *See also Cosner v. United Penn Bank,* 358 Pa.Super. 484, 517 A.2d 1337 (1986) (points not argued in argument section of appellate brief are waived).

Westinghouse again preliminarily objected and succeeded in having Count VII (interference with contractual relations) dismissed. NYSEG did not appeal the dismissal of this count. The other counts were retained, subject to Westinghouse's right to file a motion for summary judgment. Westinghouse then filed its motion for summary judgment. As previously stated, this motion was granted on two of the many grounds Westinghouse had asserted: first, that the parties' contracts barred recovery for any of the alleged damages on any of the pleaded theories, and second, that since all of the damages sought in Counts I through VI and X, i.e. the tort counts, were purely economic losses, no recovery for such damages could be obtained under Pennsylvania tort law.[3]

## DISCUSSION

On review of a grant of a motion for summary judgment, we must review all of the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. If we find, however, that the record, thus analyzed, reveals no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, we must affirm. *Washington Federal Savings & Loan Assn. v. Stein*, 357 Pa.Super. 286, 515 A.2d 980 (1986).

### A. *Contracts*

This is a case involving a commercial dispute between sophisticated enterprises that have established their rights and liabilities by contract. The dispute arises from alleged defects in a product that resulted in no physical

---

**3.** Westinghouse also sought summary judgment on the ground that all counts of the amended complaint were barred by the Pennsylvania Statute of Repose, that the Amended Complaint was late-filed, and that certain counts of the complaint provided no ground for recovery either because of prior releases between the parties or the parol evidence rule. The trial court did not opine at any length on these contentions, presumably because it ruled in Westinghouse's favor on the grounds expressed in text above. The court did state, however, that these contentions did not support summary judgment because they either involved factual disputes or were meritless.

injury or damage to anything but the product itself. West-inghouse filed a properly supported Motion for Summary Judgment based on the argument that the parties' contracts dictate as a matter of law that recovery be denied. The Motion was accompanied by copies of the relevant agreements, and an affidavit of a Westinghouse employee familiar with these agreements which verifies that the attached documents are the agreements of the parties. NYSEG did not file any responsive affidavit or other material raising a factual dispute as to the authenticity or proper interpretation of the agreements.

Nor does NYSEG dispute the general enforceability of the exclusive warranties and remedies and limitation of liability clauses in the agreements, on grounds of unconscionability or otherwise. NYSEG concedes that under Pennsylvania law, contractual provisions limiting warranties, establishing repair or replacement as the exclusive remedy for breach of warranty and excluding liability for special, indirect and consequential damages in a commercial setting are generally valid and enforceable. *See* 13 Pa. Cons.Stat.Ann. §§ 2316, 2718 & 2719 (1982); *National Cash Register Co. v. Modern Transfer Co.,* 224 Pa.Super. 138, 302 A.2d 486 (1973); *Eimco Corp. v. Lombardi,* 193 Pa.Super. 1, 162 A.2d 263 (1960); *Magar v. Lifetime, Inc.,* 187 Pa.Super. 143, 144 A.2d 747 (1958). Thus, NYSEG must be held to have conceded that the parties' agreements are preclusive of Westinghouse's liability for the alleged damages unless there is some other legal bar to the application of the agreements to the instant facts.

The trial court concluded that there was no legal bar to the application of the agreements and we agree.

We need not opine at any great length to demonstrate that the previously quoted portions of the parties' agreements on their face preclude recovery as a matter of law under all of NYSEG's properly preserved theories of relief. These agreements establish unequivocally that as a result of the restrictions on remedies to which NYSEG agreed, Westinghouse's sole obligation in response to a claim of

improper performance of services or defective materials is repair or replacement efforts. Moreover, the parties specifically allocated the risks of uncertain events and consequences, including the risk that the generator would be out of service for some time, by agreeing to a limitation on Westinghouse's liability. Thus, the agreements provide that Westinghouse will not be liable for loss of profits, loss of use, cost of replacement power or any other consequential damages, in tort, contract or otherwise. Yet these are precisely the damages sought by the amended complaint.

The amended complaint seeks to recover, under both tort and contract (warranty) theories, for lost profits, costs of replacement power and other incidental expenses associated with the repairs to the Unit No. 1 generator. But whether pleaded in contract or tort, these damages are not recoverable. Westinghouse has fully performed any obligations it might have had for nonconforming services or products under the agreements. It has repaired the Unit No. 1 generator, which functioned properly after the replacement of the seal in January 1984 and which has functioned properly since the new blower spacer was installed in May—July 1984. Thus, Westinghouse has fulfilled its contractual obligation to repair or replace and it has no further liability.

### B. *Negligence and Strict Liability*

■ Moreover, even in the absence of the parties' agreements, we would nevertheless hold that NYSEG's recovery for the damages pleaded in the negligence and strict liability counts is barred as a matter of law because the losses alleged are purely economic in nature and cannot be recovered in negligence or strict liability. *REM Coal Company, Inc. v. Clark Equipment Co.*, 386 Pa.Super. 401, 563 A.2d 128 (1989) (en banc). As stated above, all of the losses NYSEG alleged are economic in nature, i.e. loss of profits, cost of replacement energy and other costs associated with the repairs. There is no allegation that the alleged defects in the generator caused any personal injury. Although NYSEG does allege that the defective portions of the gener-

ator caused damage to other parts of the generator, in an attempt to demonstrate that the alleged defects in the generator caused non-economic damage to "other property" of NYSEG, this contention is clearly without merit. As this court held in *Industrial Uniform Rental Co. v. International Harvester Co.*, 317 Pa.Super. 65, 463 A.2d 1085 (1983), where various components of a product are provided by the same supplier as part of a complete and integrated package, even if a defect in one component damages another, there is no damage to "other property" of the plaintiff. *Id.*, 317 Pa.Superior Ct. at 77–78, 463 A.2d at 1092 (quoting *Northern Power & Engineering Co. v. Caterpillar Tractor Co.*, 623 P.2d 324, 330 (Alaska 1981). This is, therefore, a case where the alleged defect in the product only resulted in an impairment of the quality of the product itself and consequential damages.

In our opinion in the companion to this case, *REM Coal Company, Inc. v. Clark Equipment Co.*, this court has held that economic losses are not recoverable in negligence or strict liability in a product liability action. Application of that holding to the negligence and strict liability counts of NYSEG's complaint compels the conclusion that the pleaded damages are not recoverable.

The rationale underlying our decision in *REM Coal* is peculiarly applicable to this case. In *REM*, we adopted the rationale of the United States Supreme Court in *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). There, the Supreme Court expressed its concern for maintaining the separate spheres of the law of contract and tort. It emphasized that where an allegedly defective product causes damage only to itself, and other consequential damages resulting from the loss of the use of the product, the law of contract is the proper arena for redressing the harm because in such a case, the damages alleged relate specifically to product quality and value as to which the parties have had the opportunity to negotiate and contract in advance. They have allocated the risks of possible types of losses,

and agreed on the level of quality that will be given for the price demanded. When the product fails to conform and only economic losses result, the parties' recovery one against the other for economic losses should be limited to an action on that contract and no additional recovery in negligence or strict liability is permitted.

In the instant case, the parties did enter into fully integrated contracts governing the product involved. They agreed to limited warranties regarding the quality of the product and services to be provided by Westinghouse and to limited remedies for a failure to conform to those warranties. They further allocated the risk of business interruption losses to NYSEG alone. They must now be held to those agreements and cannot avoid them under theories of negligence or strict liability.

### C.  *Fraud*

Having so concluded, we must now consider NYSEG's two remaining arguments in support of its right to recover the pleaded damages. Each of these is aimed at eliminating the parties' agreements as a bar to recovery of the pleaded damages. We need not consider any of these arguments in the context of NYSEG's negligence and strict liability causes of action since we have already determined that recovery under those theories is barred as a matter of law by the doctrine that precludes recovery of economic losses in a product liability action based on either negligence or strict liability. We must consider them, however, in connection with NYSEG's breach of contract and breach of warranty claims and in connection with NYSEG's alleged fraud theory.[4]

The first argument is that the parties' agreements may not be enforced against NYSEG in the context of this dispute because Westinghouse defrauded NYSEG and two legal consequences flow from this alleged fraud: first, that Westinghouse should be precluded from relying on the

---

**4.** We need not and do not decide whether the bar to recovery of economic losses would apply in a tort product liability action based on fraud since in this case, we decide that NYSEG has not pleaded and preserved any fraud cause of action.

552

exclusive remedies and limitation of liability provisions of the agreements because the agreements were fraudulently induced; and, second, that NYSEG has a tort action for fraud against Westinghouse.

NYSEG alleges that Westinghouse fraudulently induced NYSEG to enter into the two specific purchase orders relating to the January 1984 and April 1984 repairs. Significantly, there is no allegation that Westinghouse fraudulently induced NYSEG to enter into either the 1979 Fixed Price Supply Contract or the 1983–84 Blanket Purchase Order. NYSEG also alleges that it has a tort action for fraud against Westinghouse based on Westinghouse's intentional misrepresentations concerning the need to take Unit No. 1 out of service in the spring of 1984, the presence of an "indication" of a possible crack in Unit No. 1 in the spring of 1984, the nature of the replacement seal put on the generator in January 1984 and the fact that the spring repairs would be completed by June 10, 1984.

NYSEG secondarily asserts that the limited remedies provided in the agreements failed of their essential purpose, thus allegedly opening the door under Section 2719(b) of the Uniform Commercial Code to complete recovery by NYSEG of all of the alleged damages, whether compensatory or consequential. 13 Pa.Cons.Stat.Ann. § 2719(b) (1984).

■ We begin with the fraud theory. The trial court made no mention of NYSEG's fraud theory, either as an impairment of the enforceability of the parties' agreements or as support for a tort fraud claim. In other words, the trial court dealt with the issues as if this case presented no fraud claim. NYSEG argues that this was error, contending that the court ignored a crucial part of NYSEG's case. Westinghouse responds that the trial court did not deal with NYSEG's fraud claim because the case actually involves no cognizable fraud claim. We agree. The trial court correctly did not take into consideration NYSEG's inadequately pleaded and argued and totally unsupported allegations of fraud, nor will we.

Fraud is a claim easily made but difficult to support. Once an allegation of fraud is injected into a case, even though it may ultimately be shown to be without any arguable merit, the whole tone and tenor of the matter changes. An allegation of fraud opens the door not only to recovery on an independent tort theory of deceit, as to which certain defenses applicable to pure negligence do not apply, but may also provide a defense to enforcement of an otherwise binding contract or a ground for rescission thereof. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243 (1983); *Myers v. Rubin*, 399 Pa. 363, 160 A.2d 559 (1960).

In order to protect those against whom generalized and unsupported allegations of fraud may be levied, the Pennsylvania Rules of Civil Procedure require that fraud be "averred with particularity." Pa.R.C.P. 1019(b). Thus, a party raising a claim of fraud must set forth in its pleading specific facts to support the alleged fraud. As the Supreme Court has explained this requirement and its purpose:

> Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation or offered simply to harass the opposing party and to delay the pleader's own obligation.... The pleadings must adequately explain the nature of the claim to the opposing party so as to permit him to prepare a defense and they must be sufficient to convince the court that the averments are not merely subterfuge.

*Bata v. Central–Penn National Bank of Philadelphia,* 423 Pa. 373, 379–80, 224 A.2d 174 (1966), *cert. denied,* 386 U.S. 1007, 87 S.Ct. 1348, 18 L.Ed.2d 433 (1967). These requirements apply whether fraud is pleaded affirmatively or defensively. *Id.*

In applying this standard to this case, we have carefully examined the pleadings and other documents of record. Having done so, we conclude that NYSEG presented no more than general and constantly shifting averments of "negligent and/or intentional misrepresentation", "fraud"

and "fraud in the inducement" to the trial court. Nor did NYSEG present any evidentiary or legal support for these averments in response to Westinghouse's motion for summary judgment.

We begin with NYSEG's cause of action in tort for fraud. It is in Count III of the original complaint that NYSEG claims it first and timely raised its fraud theory. Examination of this count reveals, however, that it not only makes no mention of fraud, but also does not allege any specific facts supporting fraud. It alleges only that throughout the relevant period, i.e. January to July, 1984, Westinghouse had insufficient knowledge of the nature of the problems with the Unit No. 1 generator or others of its type to know precisely what might be wrong with them. It further states that notwithstanding this lack of knowledge, Westinghouse nevertheless "advised and informed" NYSEG that Unit No. 1 should be taken out of service in April, that it had an "indication" of a problem, that a new blower spacer should be installed and that this would be done by June 10, 1984. These are then alleged to be "either negligent misrepresentations or intentional misrepresentations", "as a result" of which NYSEG took Unit No. 1 out of service and had the repairs done.

This is not adequate pleading of fraud, either as a ground for recovery or as a defense to the agreements on the ground that they were induced by fraud. The elements of fraud are:

1. a misrepresentation,
2. a fraudulent utterance thereof,
3. an intention by the maker that the recipient will thereby be induced to act,
4. justifiable reliance by the recipient upon the misrepresentation, and
5. damage to the recipient as the proximate result.

*Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. at 107–08, 464 A.2d at 1252.

The central problem with the allegations in the original complaint is that they do not set forth specific facts to

support a claim that Westinghouse, with fraudulent intent and knowledge of the falsity of its statements, gave advice to NYSEG to induce it to act to its own detriment. Rather, the whole basis of the original complaint's count III is Westinghouse's *lack* of knowledge. There is no allegation that Westinghouse knew that Unit No. 1 should not be taken out of service, or knew that it had no indication of a problem, or knew that it needed no repairs. There is also no allegation that NYSEG's reliance on Westinghouse's advice was justifiable. There is only an allegation that NYSEG took the Unit out of service and had it repaired "as a result" of Westinghouse's advice.

■ Although NYSEG later supplemented these allegations by alleging new facts specifically in support of the fraud cause of action, it did so in an amended complaint which was concededly filed after the statute of limitations applicable to fraud had already expired. 42 Pa.Cons.Stat. Ann. 5524(7). It is axiomatic that a party may not plead a new cause of action in an amended complaint when the new cause of action is barred by the applicable statute of limitations at the time the amended complaint is filed. *Del Turco v. Peoples Home Savings Assn.*, 329 Pa.Super. 258, 478 A.2d 456 (1984).[5]

Thus, we find that since NYSEG failed to timely and properly plead a cause of action for fraud in the trial court, it was proper for the trial court to refuse to consider such a cause of action in deciding on Westinghouse's motion for summary judgment and we will similarly refuse to consider it in reviewing the grant of summary judgment.

Of greater importance to NYSEG is its argument that Westinghouse fraudulently induced NYSEG to enter into some or all of the contractual arrangements referred to above. Unfortunately, NYSEG's pleadings and other doc-

---

**5.** Westinghouse filed preliminary objections on this ground. It also raised the statute of limitations as to fraud in its Answer and New Matter filed in response to the amended complaint. Although the trial court denied Westinghouse's preliminary objections, it did so specifically without prejudice to Westinghouse raising the same arguments in a motion for summary judgment, which Westinghouse later did.

uments filed in the trial court were equally inadequate in raising fraud in the inducement as a reply to Westinghouse's defense based on the parties' agreements. Westinghouse raised the defense of the agreements as new matter in its answer to the amended complaint. NYSEG's reply to new matter states only that the contracts are not preclusive of NYSEG's recovery because Westinghouse "abrogated and vitiated" the contracts by its "conduct" as described in the amended complaint and because of Westinghouse's "misrepresentations". There are no allegations as to which specific representations induced NYSEG to enter into which specific contract, when they were made, or how they constituted such a fraudulent inducement.

Nor did NYSEG's brief in response to the motion for summary judgment contain any specific argument concerning the allegations contained in count III of the amended complaint. The response summarily states that the parties' agreements cannot be enforced against NYSEG because "Westinghouse made other promises, warranties and representations to which the plaintiff has referred in its amended complaint" and "misrepresented the very purpose for which it requested permission to remove and test the part" and that "the agreements are of no effect on the present disputes because of the subsequent misrepresentations and dealings between the parties." There is no legal argument concerning either fraud or fraud in the inducement. Moreover, no evidence of any of the allegations of fraud was submitted in opposition to the motion for summary judgment.[6]

We will not permit NYSEG to defend against a motion for summary judgment in the trial court merely by repeating its generalized allegations of fraud, with no evidentiary

---

**6.** NYSEG repeatedly states throughout its brief that Westinghouse admitted all of the facts pleaded in the Amended Complaint, including those relating to fraud, for purposes of the Motion for Summary Judgment. In fact, the Motion for Summary Judgment only presented a synopsis of the relevant allegations of the Amended Complaint and admitted the facts in the synopsis, and only those facts, for purposes of the Motion. Since the synopsis did not include the fraud allegations, Westinghouse did not admit to fraud.

support therefor and without pertinent legal argument, and then argue before this court that its *central* factual and legal contention is based on fraudulent inducement. Thus, we will analyze this case as did the trial court, i.e. as a case in which NYSEG has failed properly to assert any fraud claim, whether as an affirmative theory of relief or as a ground for avoidance of the parties' agreements. We regard NYSEG's assertions of fraud as nothing more that a subterfuge to avoid the clear impact of its freely negotiated agreements.

D.  *Section 2719(b) of the Uniform Commercial Code*

■ We now turn to consideration of NYSEG's only properly preserved argument against the enforceability of the exclusive remedy and limitation of liability provisions of the parties' agreements. This argument rests on Section 2719(b) of the Uniform Commercial Code, which provides:

> (b) Exclusive remedy failing in purpose.—Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.

The comment to Section 2719(b) explains that "where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of its bargain, it must give way to the general remedy provisions of this Article." 13 Pa.Cons.Stat.Ann. § 2719(b) comment 1. Noted commentators on the Uniform Commercial Code have explained that situations where an exclusive remedy will fail of its essential purpose are rare:

> There are probably relatively few situations where a remedy can fail of its essential purpose. Section 2–719(2) [Section 2719(b) ] has been called into action most often in cases ... when the exclusive remedy involves replacement or repair of defective parts, and the seller because of his negligence in repair or because the goods are beyond repair, is unable to put the goods in warranted condition. Section 2–719(2) might also apply when the

exclusive remedy requires performance of an act by the buyer that is precluded by the seller's breach.

White, J.J. & Summers, R.S., *Uniform Commercial Code,* at 469 (2d ed. 1980).

NYSEG contends that the exclusive repair or replace remedy provided for in the parties' agreements failed of its essential purpose because Westinghouse willfully misrepresented facts concerning the need to remove the blower spacer in April 1984 and engaged in dilatory conduct in replacing the blower spacer in the period from May through July 1984.

It is true that Section 2719(b) has most frequently been applied to defeat an exclusive remedy provision where the provision limited the buyer's remedy to repair or replacement and the seller either refuses or is unable to provide this remedy within a reasonable time. *See* Foss, *When to Apply the Doctrine of Failure of Essential Purpose to an Exclusion of Consequential Damages: An Objective Approach,* 25 Duquesne L.Rev. 551, 554 n. 11 (1988), and cases cited therein. Some courts have also considered a seller's alleged bad faith in determining whether an exclusive remedy has failed of its essential purpose. *Id.* at 565–569 and cases cited therein. However, we are not persuaded that this case presents circumstances that warrant excision of the exclusive remedy provisions of the parties' agreements under Section 2719(b).[7]

First, as we have opined above, NYSEG has simply not preserved any argument based on a wilful misrepresentation by Westinghouse that would undercut the enforceability of the parties' agreements. As to the length of time it took Westinghouse to perform the replacement of the blow-

7. Since we decide that the exclusive remedy provisions have not failed of their essential purpose, we need not decide the related and more difficult issue of the effect of such a failure on the limitation of liability provision. NYSEG assumes that once it is demonstrated that an exclusive remedy provision has failed, all limitations on liability, including an exclusion of consequential damages, automatically fail also. In fact, there is a split of opinion on this issue, with many courts holding that even where an exclusive remedy like repair and replacement has failed, an exclusion of consequential damages remains effective. *See* Foss, cited in text *supra,* at 555–556 n. 14.

er spacer, we once again find that the parties' agreements govern. The parties entered into a specific purchase order for the performance of the replacement of the blower spacer which incorporated all of the limitation of liability and exclusive remedy language set forth above. This purchase order was executed in May 1984 and provides on its face that the repairs would be completed by July 2, 1984. In fact, the fully repaired generator was returned to NYSEG only four days later, on July 6, 1984.

It is not this de minimus four day period that constitutes the alleged inordinate delay in the repairs. NYSEG appears to argue that Westinghouse orally represented that the blower spacer would be returned by June 10, 1984 and that the inordinate delay arises from the gap between this date and the actual return date of July 6, 1984. NYSEG's argument regarding this alleged representation of a June 10, 1984 return date is somewhat confusing. As originally pleaded, the argument appeared to be that Westinghouse made this representation *prior* to execution of the purchase order. However, NYSEG was then met with Westinghouse's well-supported response that such an unsupported allegation of a prior oral agreement could not be admitted to vary the terms of the fully integrated agreement of the parties, i.e. the May 1984 purchase order, which on its face contradicts this representation. *Gianni v. R. Russell and Co., Inc.*, 281 Pa. 320, 126 A. 791 (1924); *Bardwell v. Willis Co., Inc.*, 375 Pa. 503, 100 A.2d 102 (1953); *McGuire v. Schneider, Inc.*, 368 Pa.Super. 344, 534 A.2d 115 (1987), *aff'd*, 519 Pa. 439, 548 A.2d 1223 (1989). NYSEG then responded that the alleged misrepresentation occurred *after* execution of the purchase order. NYSEG appeared to be arguing that this representation constituted a separate agreement of the parties or, presumably, an oral modification of the purchase order.

We find that the terms of the fully integrated agreement govern. NYSEG has not presented a validly preserved claim of fraud in the inducement as to this agreement and any evidence of a prior oral term of the agreement is, therefore, inadmissible to vary its terms. *See*

cases cited, *supra.* If, on the other hand, NYSEG is alleging that the representation as to when the repairs would be complete was made after the execution of the agreement and constitutes a separately enforceable contractual obligation, then we find that the allegation must nevertheless fail as a matter of law. There is no allegation of separate consideration to support the modification and no argument as to how NYSEG would propose to overcome the terms of the parties' Fixed Price Supply Contract which forbids oral modifications and which was fully incorporated into the subject purchase order. Nor did NYSEG submit a shred of evidence to support the existence of this alleged modification to the purchase order in opposition to Westinghouse's motion for summary judgment.

Thus, we construe Westinghouse's obligation as to the time it would take to repair the generator in the spring of 1984 to be as expressed in the purchase order, i.e. the promised return date was July 2, 1984. Given this conclusion, it is beyond cavil that the exclusive remedy these parties agreed to operated just as the parties contemplated. Westinghouse did not attempt to refuse to perform the remedy, and except for a de minimus delay of four days in returning the generator, Westinghouse performed within the time it had agreed to perform. This is not a case where the exclusive remedy of repair or replacement has failed, but rather a case where the remedy was completely and fully performed. The fact that consequential damages nevertheless resulted was clearly a possibility that the parties foresaw and bargained for at the inception of their relationship. See *Posttape Associates v. Eastman Kodak Co.,* 450 F.Supp. 407 (E.D.Pa.1978). NYSEG's argument based on § 2719(b) is simply another attempt to avoid its own agreement that it would bear the risk that profits would be lost and replacement energy costs incurred during any shutdown of the generator.

Judgment affirmed.

JOHNSON, J., files concurring statement.

McEWEN, J., joins in concurring statement by JOHNSON, J.

JOHNSON, Judge, concurring.

I agree that the judgment in favor of Westinghouse Electric Corporation must be affirmed. I have difficulty accepting the majority's treatment of Count III of plaintiff's complaint. The majority would treat an inadequate averment of fraud in the original complaint as being incapable of correction following the passing of the limitations period.

The appellant has not raised as error the trial court's treatment of the fraud allegation. I do not read *Del Turco v. Peoples Home Savings Assn.*, 329 Pa.Super. 258, 478 A.2d 456 (1984), as prohibiting attempts to cure an inadequate pleading merely because the statute of limitations may have run during the interim between the original and the amended pleading.

On my review of the pleadings, I would find that the generalized allegations of fraud contained in plaintiff's amended complaint do not satisfy the specificity requirements of *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243 (1983). I would, therefore, avoid ruling on a point which was not considered by the distinguished trial judge and was not advanced in appellant's brief.

McEWEN, J., joins in this concurring statement.