**PRESBYTERIAN MEDICAL CEN-
TER, 1215 Hulton Road, Oakmont,
Pennsylvania 15139, Appellant,**

v.

**Elizabeth G. BUDD, 173 Main Street,
Apt. A, Sandwich, MA 02653–
2284, Appellee.**

Superior Court of Pennsylvania.

Argued March 12, 2002.

Filed Aug. 29, 2003.

Chris Lucas, Harrisburg, for appellant.

Martin A. Dietz, Pittsburgh, for appellee.

BEFORE: TODD, BENDER, and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 Appellant, Presbyterian Medical Center ("PMC"), asks us to review the order entered in the Allegheny County Court of Common Pleas, which sustained the preliminary objections filed by Appellee, Elizabeth Budd ("Ms. Budd"), and dismissed with prejudice PMC's complaint alleging breach of contract, fraud, violations of the Uniform Fraudulent Transfer Act ("UFTA"), and equitable support and restitution. Specifically, PMC submits it has pleaded sufficient facts to hold Ms. Budd liable for the outstanding debt owed to PMC by Ms. Budd's mother, Betty S. Budd ("Mother"), who was a PMC resident at the time of her death. We hold that the trial court properly dismissed PMC's complaint on all counts except for PMC's count for equitable support and restitution. On that count, we hold that PMC has established a cause of action sounding in support under 62 P.S. § 1973. Accordingly, we affirm in part, reverse in part, and remand for further proceedings regarding PMC's support action against Ms. Budd.

¶ 2 The relevant facts and procedural history of this case have been gleaned from the certified record on appeal. PMC is a long term care nursing facility located in Oakmont, Pennsylvania. Mother was a resident of PMC at the time of her death on November 5, 1999. Mother owed PMC an outstanding balance of $96,000 at the time of her death.[1]

¶ 3 Prior to Mother's death, PMC sought to collect Mother's outstanding medical bills, but was told by Ms. Budd that Mother's resources were exhausted. Ms. Budd then promised PMC she would filed an application for medical assistance with the Pennsylvania Department of Public Welfare ("DPW") on behalf of Mother. However, both PMC and Ms. Budd knew that Mother would not qualify for medical assistance because her available resources exceeded DPW's maximum resource limit. Consequently, Ms. Budd allegedly promised to "spend down"[2] Mother's resources on medical expenses until Mother's resources were depleted below the maximum resource limit. In exchange for this oral promise, PMC refrained from attempting to bring Mother's account current. However, Ms. Budd did not "spend down" Mother's resources on medical expenses; instead, PMC believes Ms. Budd used her power of attorney over Mother to transfer more than $100,000 to herself from Mother's various bank accounts. PMC also alleges that shortly after Mother's death, Ms. Budd transferred to herself an additional $60,000 from Mother's checking account. In fact, DPW eventually rejected Mother's application for medical assistance because Mother's available resources exceeded the available resource threshold. PMC appealed DPW's eligibility determination on behalf of Mother.[3]

¶ 4 On October 19, 2001, PMC filed a complaint against Ms. Budd alleging claims of fraud, negligent misrepresentation, intentional interference with contractual relations, and violations of the Uni-

---

1. This amount was reduced to approximately $68,000 after PMC was paid approximately $28,000 through the accounting of Mother's estate in Orphan's Court.

2. DPW does not count resources used to pay medical expenses as "available" resources when determining eligibility for medical assistance. 55 Pa.Code § 178.1(j). Thus, an applicant may qualify for medical assistance by "spending down" her available resources on medical expenses in order to bring her total resources under the applicable resource limit. Id.

3. On September 30, 2002, PMC and DPW allegedly reached a settlement agreement on Mother's retroactive right to receive medical assistance.

form Fraudulent Transfer Act. Ms. Budd filed preliminary objections in the nature of a demurrer, and the court held a hearing on these preliminary objections on January 30, 2002. After the hearing, the court issued an order granting Ms. Budd's preliminary objections and dismissing PMC's complaint with leave to amend. PMC filed its first amended complaint on February 19, 2002, raising claims of breach of contract, fraud, violations of UFTA, and equitable support and restitution. Ms. Budd again filed preliminary objections in the nature of a demurrer. In an order dated June 26, 2002, the trial court granted Ms. Budd's preliminary objections and dismissed PMC's case with prejudice. This timely appeal followed.

¶ 5 PMC raises the following issues for our review:

WHETHER THE FACTS PLED IN THE ORIGINAL COMPLAINT OR THE FIRST AMENDED COMPLAINT FAIL TO ESTABLISH A CAUSE OF ACTION UNDER ANY THEORY OF THE LAW UPON WHICH RECOVERY COULD BE OBTAINED?

WHETHER THE TRIAL COURT VIEWED ALL FACTS IN THE LIGHT MOST FAVORABLE TO [PMC] WHEN FACED WITH DOUBTS AS TO THE LEGAL SUFFICIENCY OF THE CLAIMS ADVANCED?

(PMC's Brief at 4).[4]

¶ 6 Preliminary objections may be filed on the grounds that a pleading fails to conform to a rule of court, contains insufficient specificity, or is legally insufficient. Pa.R.C.P. 1028(a). When reviewing a trial court's grant of preliminary objections in the nature of a demurrer:

All material facts set forth in the pleadings as well as all inferences reasonably deducible therefrom are admitted as true for the limited purpose of this review. The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it. In reviewing the grant of a demurrer we are not bound by the inferences drawn by the trial court, nor are we bound by its conclusions of law. Furthermore, we will affirm the grant of such a motion only when the moving party's right to succeed is certain and the case is so free from doubt that further proceedings would clearly be fruitless.

*Foflygen v. R. Zemel, M.D. (P.C.)*, 420 Pa.Super.18, 615 A.2d 1345, 1352 (1992), *appeal denied*, 535 Pa. 619, 629 A.2d 1380 (1993).

¶ 7 PMC argues that it formed a valid contract with Ms. Budd when she agreed to "spend down" Mother's account on medical expenses. PMC contends Ms. Budd breached this contract when she transferred Mother's money to herself instead of using the money to "spend down" Mother's resources. PMC maintains that Ms. Budd's breach of the agreement caused DPW to reject Mother's medical assistance application. Therefore, PMC concludes the trial court erred when it dismissed the breach of contract claim against Ms. Budd. We disagree.

 ¶ 8 To support a claim for breach of contract, a plaintiff must plead: 1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damage. *Corestates Bank, N.A. v. Cutillo*, 723 A.2d

---

4. For ease of disposition we address PMC's claims together.

1053 (Pa.Super.1999). Contracts are enforceable when parties reach mutual agreement, exchange consideration and have set forth terms of their bargain with sufficient clarity. *Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 664 A.2d 159, 163 (1995). "While not every term of a contract must be stated in complete detail, every element must be specifically pled." *Corestates Bank, N.A., supra* at 1058.

¶ 9 Additionally, "When any claim...is based on an agreement, the pleading shall state specifically if the agreement is oral or written." Pa.R.C.P. 1019(h). No action can be brought against a defendant for her promise to answer for the debt of another, unless it is in writing. 33 P.S. § 3. "When any claim...is based upon a writing, the pleader shall attach a copy of the writing, or the material part thereof, but if the writing or copy is not accessible to the pleader, it is sufficient so to state, together with the reason, and to set forth the substance in writing." Pa.R.C.P. 1019(i).

■ ¶ 10 Here, PMC averred Ms. Budd agreed to apply for medical assistance on behalf of Mother in exchange for PMC's promise to refrain from bringing Mother's account current. The terms of the agreement involve PMC and Mother, not PMC and Ms. Budd, Mother's attorney-in-fact. Indeed, it is Mother who enjoyed the benefits of the care provided by PMC, and PMC who enjoyed the benefit of Mother's payments. Ms. Budd, operating as Mother's attorney-in-fact, agreed to "spend down" Mother's resources so that Mother could qualify for medical assistance, in exchange for PMC's promise not to bring Mother's account current. PMC simply has not pleaded sufficient facts to establish a contractual basis for holding Ms. Budd liable to any agreement between

Mother and PMC. *See Corestates Bank, N.A., supra.* Moreover, Ms. Budd's liability to Mother's estate for any improper or fraudulent transfers is an issue properly raised in Orphan's Court during an accounting of Mother's estate.

■ ¶ 11 Furthermore, any agreement whereby Ms. Budd promised to answer for Mother's debt would have had to be in writing. *See* 33 P.S. § 3. PMC's complaint does not indicate whether the alleged contract is written, does not attach a copy of any written contract, and does not explain why a written contract could not be obtained. *See* Pa.R.C.P. 1019(i). Thus, PMC has failed to plead the minimum information necessary to establish the existence of a contract between PMC and Ms. Budd. *See* Pa.R.C.P. 1028(a); *Corestates Bank, N.A., supra.* For these reasons, the trial court properly dismissed PMC's breach of contract claim. *See Foflygen, supra.*

■ ¶ 12 Similarly, PMC has alleged that on November 4, 1999, Ms. Budd told Robert Macie ("Macie"), a DPW employee, she would use Mother's excess resources to pay Mother's medical bills. Macie subsequently informed PMC of Ms. Budd's statement regarding payment of Mother's medical bills. PMC believes it was foreseeable that Macie, a DPW employee, would share this information with PMC. PMC complains it detrimentally relied on Ms. Budd's representations to DPW. In other words, PMC suggests it is a third-party beneficiary to Ms. Budd's agreement with DPW.[5] We cannot agree.

A party becomes a third-party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, ...un-

---

**5.** Although PMC does not specifically raise a third-party beneficiary claim, on appeal from the grant of a demurrer we must review

whether any recovery is possible based on the facts averred. *See Foflygen, supra.*

less, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Deeter v. Dull Corp., Inc.,* 420 Pa.Super. 576, 617 A.2d 336, 340 (1992), *appeal denied,* 535 Pa. 619, 629 A.2d 1380 (1993).

¶ 13 Here, Ms. Budd allegedly told Macie, a DPW employee, she would "spend down" Mother's account on medical bills. However, PMC fails to identify what consideration Ms. Budd received in exchange for her "promise" to DPW. When assessing medical assistance eligibility, DPW is statutorily obligated to exclude medical expense payments from available income. 55 Pa.Code § 178.1(j). Certainly DPW's consideration could not have been its promise to perform what it was already legally bound to do. *See Pennsylvania State University v. University Orthopedics, Ltd.,* 706 A.2d 863 (Pa.Super.1998) (stating performance of act that person is already legally obligated to do is not sufficient consideration to support agreement). Thus, PMC cannot be a third-party beneficiary to a non-existent contract between Ms. Budd and DPW. *See Deeter, supra.*

¶ 14 PMC also argues it has sufficiently pleaded a cause of action for fraud against Ms. Budd. PMC asserts Ms. Budd misrepresented her intention to "spend down" Mother's resources on medical expenses. PMC further complains that Ms. Budd "sabotaged" Mother's application for medical assistance when she failed to "spend down" Mother's available resources. PMC submits that it justifiably relied on Ms. Budd's misrepresentations that she would attempt to qualify Mother for medical assistance. As a result, PMC believes it was

denied a possible source of payment for Mother's outstanding medical bills. Thus, PMC concludes the trial court erred when it dismissed PMC's fraud claim. We disagree.

 ¶ 15 The elements of fraud, or intentional misrepresentation, are (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Gibbs v. Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994) (citing Restatement (Second) of Torts § 525 (1977)). The essence of fraud is a misrepresentation fraudulently uttered with the intent to induce the action undertaken in reliance upon it, to the damage of its victim. *Martin v. Hale Products, Inc.,* 699 A.2d 1283, 1288 (Pa.Super.1997) (quoting *Moser v. DeSetta,* 527 Pa. 157, 163, 589 A.2d 679, 682 (1991)) (internal quotation marks omitted). Furthermore,

In order to protect those against whom generalized and unsupported fraud may be levied, the Pennsylvania Rules of Civil Procedure require that fraud be "averred with particularity." Pa.R.C.P. 1019(b). Thus, a party raising a claim of fraud must set forth in its pleadings specific facts to support the alleged fraud. As the Supreme Court has explained this requirement and its purpose:

Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation or offered simply to harass the opposing party and to delay the pleader's own obligation.... The pleadings must adequately explain the nature of

the claim to the opposing party so as to permit him to prepare a defense and they must be sufficient to convince the court that the averments are not merely subterfuge.

*Bata v. Central–Penn National Bank of Philadelphia,* 423 Pa. 373, 379–80, 224 A.2d 174 (1966), *cert. denied,* 386 U.S. 1007, 87 S.Ct. 1348, 18 L.Ed.2d 433 (1967).

*New York State Elec. and Gas Corp. v. Westinghouse Elec. Corp.,* 387 Pa.Super. 537, 564 A.2d 919, 927 (1989).

¶ 16 In the instant matter, the crux of PMC's fraud claim seems to be that Ms. Budd lied about her intention to "spend down" Mother's resources by paying outstanding medical expenses. However, PMC fails to establish every element of its fraud claim with sufficient particularity. We have already concluded that PMC did not establish the existence of a contract between it and Ms. Budd. Thus, regarding the second element of fraud, PMC does not indicate how Ms. Budd's representation about "spending down" Mother's resources was material to any "transaction" between Ms. Budd and PMC. *See Gibbs, supra; New York State Elec. and Gas Corp., supra.* Moreover, PMC does not elucidate to whom Ms. Budd's alleged representations were made. *See Gibbs, supra.* To the extent Ms. Budd promised a DPW employee she would "spend down" Mother's resources, it is not clear how Ms. Budd could have intended that PMC would rely on a statement she made to DPW. *See id.* For these reasons, we agree with the trial court that PMC has failed to state a claim for fraud against Ms. Budd, and affirm the court's dismissal of this claim. *See New York State Elec. and Gas Corp., supra.*

¶ 17 PMC next argues that Ms. Budd is liable under UFTA. PMC contends Ms. Budd, during Mother's stay at PMC, inappropriately used her power as Mother's attorney-in-fact to remove more than $100,000 from Mother's various bank accounts. This money could have been used to pay PMC, Mother's creditor. PMC contends that Ms. Budd's status as Mother's attorney-in-fact qualifies her as a "debtor" under UFTA, making Ms. Budd liable to PMC for the allegedly fraudulent withdrawals. Therefore, PMC concludes the trial court erred in dismissing the UFTA claim. We disagree.

¶ 18 A fraudulent transfer under UFTA is defined as follows:

**§ 5104. Transfers fraudulent as to present and future creditors**

**(a) General rule.**—A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

**(b) Certain factors.**—In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa.C.S.A. § 5104. A "debtor" is defined as "one who is liable on a claim." 12 Pa.C.S.A. § 5101(b). A "creditor" is a person who has a claim. *Id.*

¶ 19 In the instant appeal, PMC asks us to recognize an UFTA cause of action against Ms. Budd for allegedly fraudulent transfers she made as Mother's attorney-in-fact. This Commonwealth has not recognized a UFTA claim targeting the attorney-in-fact of a debtor. To permit such an action we would have to conclude that Ms. Budd's status as attorney-in-fact qualifies her as a "debtor" under UFTA. In other words, we would have to conclude an attorney-in-fact of a debtor is liable on the debtor's claim to a creditor.

¶ 20 PMC presents no Pennsylvania legal authority to support or explain its novel proposition. Instead, PMC relies extensively on *Aristocrat Lakewood Nursing Home v. Mayne,* 133 Ohio App.3d 651, 729 N.E.2d 768 (1999) to support its claim. The *Aristocrat* case involved a daughter who abandoned her step-father in a nursing home after using her power of attorney to transfer substantially all of his resources into her checking account. The Ohio Court of Appeals held the nursing home had a valid UFTA action against the daughter. Thus, *Aristocrat* stands for the proposition that at least under certain circumstances, an attorney-in-fact of a debtor may also qualify as a "debtor" under the Ohio UFTA.

¶ 21 The facts in *Aristocrat* are similar to the present case. Moreover, Ohio and Pennsylvania have substantially similar UFTA codifications. *See* Oh. St. §§ 1336.01 *et seq.;* 12 Pa.C.S.A. §§ 5101 *et seq.* However, the *Aristocrat* court does not explain the particulars of its finding that the attorney-in-fact of a debtor qualified as a "debtor" for purposes of Ohio's UFTA. We conclude that PMC has not pleaded sufficient facts to establish that link under **Pennsylvania** law. For that reason, we decline to decide as a general matter whether this Commonwealth's definition of "debtor" under UFTA includes the attorney-in-fact of a debtor. Hence, the trial court properly dismissed PMC's UFTA claim against Ms. Budd. As noted in the context of PMC's general fraud claim, Ms. Budd's liability to Mother's estate for any improper or fraudulent transfers is an issue properly raised in Orphan's Court during an accounting of Mother's estate.

¶ 22 Finally, PMC advances a claim against Ms. Budd based on Pennsylvania

support law on indigent relatives. PMC avers that a child, if of sufficient financial ability, must maintain and financially assist an indigent parent. Accordingly, PMC believes Ms. Budd owed a duty to support her Mother, who was rendered indigent when the funds were withdrawn from her account during her stay at the nursing home. PMC maintains it should be reimbursed for the money Ms. Budd should have been paying under Pennsylvania support law. We agree.

¶ 23 In pertinent part, Pennsylvania law on support of an indigent relative reads:

§ 1973. **Relatives liable for support of indigent person; procedure to enforce support**

(a) The husband, wife, child, (except hereinafter provided), father and mother of every indigent person, whether a public charge or not, shall, if of sufficient financial ability, care for and maintain, or financially assist, such indigent person at such rate as the court of the county, where such indigent person resides shall order or direct.

\* \* \*

(b) The courts shall have power to hear, determine and make orders and decrees in such cases upon the petition of such indigent person or any other person or any public body or public agency having any interest in the care, maintenance or assistance of such indigent person.

62 P.S. § 1973. Although the support statute does not define "indigent," this Court has explained:

[T]he Act indicates that the indigent person need not be helpless and in extreme want, so completely destitute of property, as to require assistance from the public. Indigent persons are those who do not have sufficient means to pay for their own care and maintenance.

"Indigent" includes, but is not limited to, those who are completely destitute and helpless. It also includes those persons who have some limited means, but whose means are not sufficient to adequately provide for their maintenance and support.

*Savoy v. Savoy,* 433 Pa.Super. 549, 641 A.2d 596, 599–600 (1994) (quoting *Verna v. Verna,* 288 Pa.Super. 511, 432 A.2d 630, 633 (1981)).

¶ 24 A nursing home providing an indigent parent with shelter, sustenance, and care has sufficient "interest" under 62 P.S. § 1973 to bring a support action against the parent's child. *See Albert Einstein Medical Center v. Forman,* 212 Pa.Super. 450, 243 A.2d 181, 182 (1968) (permitting hospital to bring action against two children for unpaid medical bills of indigent mother); *Commonwealth ex rel. Home for the Jewish Aged v. Kotzker,* 179 Pa.Super. 521, 118 A.2d 271, 272 (1955) (concluding nursing home is "interested person" capable of bringing support action under 62 P.S. § 1973). Furthermore, an interested party, such as a hospital, may bring an action in assumpsit against a child for the unpaid medical bills of his indigent parent. *Albert Einstein Medical Center, supra. See also Savoy, supra* at 600 (concluding trial court had authority under 62 P.S. § 1973 to direct son to pay past medical expenses of indigent mother). In *Albert Einstein Medical Center,* this Court explained:

[R]ecovery for support payments made by a third party may be obtained in one of two ways. The third party may obtain a court order, securing repayment for future support of the poor person. Moreover, failure to comply with the order may subject the defendant to contempt of court, which entails a fine and/or imprisonment. Through necessity, then, such order can only act pro-

spectively, as note above, because of criminal sanctions.

The second method to obtain relief is to bring a suit in assumpsit based upon the statutory duty of support. Obviously, no criminal sanctions can be invoked under this approach as the party asking for relief cannot secure future payments of support without a court order. Pursuant to this method, the Supreme Court has stated that there is an obligation or statutory duty of support which may be the basis of an assumpsit action.

*Id.* at 184. Consequently, this Court concluded the hospital had a valid assumpsit action for reimbursement from a child for expenditures the hospital made on behalf of an indigent parent. *Id.*

 ¶ 25 Here, PMC is a nursing home that provided Mother with shelter, sustenance, and care. PMC incurred approximately $68,000 of unreimbursed expenses while caring for Mother. Accordingly, PMC had standing to bring a support action against Ms. Budd under 62 P.S. § 1973. *See Albert Einstein Medical Center, supra; Home for the Jewish Aged, supra.* We now address whether PMC has sufficiently pleaded a support action against Ms. Budd.

 ¶ 26 PMC asserts Mother became "indigent" during her stay at the nursing home when Ms. Budd removed more than $100,000 from Mother's various bank accounts. PMC avers that Ms. Budd transferred this money to her own account, leaving Mother with insufficient funds to pay PMC for their services. Consequently, Mother owed PMC an outstanding balance of approximately $96,000 [6] at the time of her death on November 5, 1999. PMC

also submits that the transfer of more than $100,000 from Mother's accounts to Ms. Budd establishes that Ms. Budd had the means to provide at least some financial support to Mother during her stay at PMC. Accepting as true all PMC's well-pleaded facts, we must agree with PMC that Mother was "indigent" under 62 P.S. § 1973 during at least a portion of her stay at the nursing home, and that Ms. Budd had the financial means to provide at least a modicum of financial support to her ailing Mother. *See Savoy, supra; Foflygen, supra.*

¶ 27 Furthermore, PMC's claim against Ms. Budd for reimbursement of the expenditures it made on behalf of her indigent Mother is nearly identical to the action this Court permitted in *Albert Einstein Medical Center, supra.* Importantly, both cases involved children who used their power of attorney status to deplete their parents' assets to the point that their parents were unable to pay their nursing home expenses. In both cases, the children did not "spend down" their parents' resources on medical bills to qualify them for public medical assistance. Also, the plaintiffs in both cases are nursing homes seeking reimbursement from the children of indigent parents for whom the nursing home had cared. However, there is one notable difference between these cases— the mother in *Albert Einstein Medical Center* was alive at the time the court recognized her son's support obligation. In the present case, PMC's February 19, 2002 complaint was filed more than two years after Mother's death.

¶ 28 Certainly, Mother's death precludes PMC from seeking reimbursement for future support under the first method described in *Albert Einstein Medical Center,*

---

**6.** As noted, this amount was later reduced to approximately $68,000 after a payment from Mother's estate.

because orders for future support are prospective from the date they are entered. *See id.* However, here PMC is seeking compensation for past services it rendered to Mother, not future reimbursement. The fact Mother is deceased should not affect PMC's ability to seek compensation for services it provided during a period when Ms. Budd should have been providing support to her indigent parent under the support laws. *See* 62 P.S. § 1973; *Albert Einstein Medical Center, supra.* This is especially true because it was Ms. Budd's actions that allegedly brought about Mother's indigent status. *See Albert Einstein Medical Center, supra.* That Mother died prior to the initiation of PMC's support action does not prejudice its ability to seek reimbursement from Ms. Budd for any support she was obligated to provide under the applicable support provisions while Mother was alive and in PMC's care. On the facts alleged in this case, we conclude PMC has established a cause of action against Ms. Budd sounding in Pennsylvania's support law. *See* 62 P.S. § 1973; *Albert Einstein Medical Center, supra.* Accordingly, we conclude the trial court erred in dismissing this claim.

¶ 29 Based on the foregoing, we hold the trial court properly dismissed PMC's complaint on all counts except the support action under 62 P.S. § 1973. On that count, we reverse and remand for further proceedings. Thus, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶ 30 Order affirmed in part and reversed in part; case remanded for further proceedings. Jurisdiction is relinquished.