COURT OF APPEALS
DECISION
DATED AND FILED

July 17, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1747**

STATE OF WISCONSIN

Cir. Ct. No. 2020CV1927

IN COURT OF APPEALS
DISTRICT IV

---

TWITCHELL TECHNICAL PRODUCTS, LLC,

    PLAINTIFF-RESPONDENT,

  V.

SPRINGS WINDOW FASHIONS, LLC,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Dane County: RYAN D. NILSESTUEN, Judge. *Affirmed in part, reversed in part and cause remanded with directions*.

Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Springs Windows Fashions, LLC ("Springs") appeals a circuit court judgment that resolved all claims in this litigation between Springs and Twitchell Technical Products, LLC ("Twitchell") in Twitchell's favor. More specifically, the court granted summary judgment in Twitchell's favor on its contract claim and on Springs' contract counterclaims. The court determined that there is no genuine dispute of material fact that Springs breached the parties' contract when it failed to pay for fabric that Twitchell manufactured for Springs. It therefore awarded Twitchell direct damages consisting of the contract price of unpaid invoices and on-hand inventory, incidental damages consisting of the costs Twitchell incurred for storing Springs' on-hand inventory, and interest. As for the counterclaims—in which Springs sought to recover the costs that it and its wholly owned subsidiary allegedly incurred based on defective and non-conforming fabric—the court determined that those damages are precluded by the terms of the applicable contract.

¶2 Regarding Twitchell's claim, we conclude that there are no genuine disputes of fact that Springs is liable for the contract price of the unpaid invoices and the contract price and storage costs for the on-hand inventory, except with respect to one on-hand inventory order. With respect to that order (1042526), there is a genuine dispute of fact regarding Springs' liability. Regarding Springs' counterclaims, we conclude that there are no genuine disputes of material fact and that Twitchell is entitled to judgment as a matter of law. Therefore, we reverse the portion of the judgment which grants summary judgment with respect to on-hand inventory order 1042526 and the award of damages associated with that order, but affirm the judgment in all other respects.

**BACKGROUND**

¶3 The following facts, which are taken from the pleadings and summary judgment materials, are undisputed except as noted below.

¶4 This appeal concerns the business relationship between three entities: Twitchell, Springs, and Mechoshade Systems, Inc. ("Mechoshade"). Twitchell is in the business of designing and manufacturing woven fabrics for use in window shades. At all times pertinent to this appeal, Mechoshade purchased Twitchell's fabric and used it to manufacture window shades, which it supplied to customers for installation in commercial buildings. Springs, which also manufactures commercial window shades, has owned all of Mechoshade's stock since 2015, and by 2017, it was also purchasing fabric from Twitchell.

¶5 The contractual relationship at issue here began in June 1989, long before Springs entered into the picture, when Twitchell and Mechoshade entered into an Exclusive Distributorship Agreement (the "Mechoshade EDA," or sometimes the "EDA"). The Mechoshade EDA, which covered all of North America, provided that Mechoshade would be granted the exclusive right to promote and distribute Twitchell's window shading product line and that Twitchell would sell its product line only to Mechoshade within that geographical territory. The Mechoshade EDA also provided that it would be governed by and interpreted in accordance with New York law.[1]

---

[1] Around the same time the Mechoshade EDA was executed, Twitchell also entered into a separate exclusive distributorship agreement with another related entity, Joel Berman Associates, that covered a different geographical territory. The parties discuss the agreement with Joel Berman Associates in their briefing, but we discuss it no further because it does not appear to be directly relevant to our resolution of the issues on appeal.

¶6      As pertinent to this appeal, the Mechoshade EDA stated that the sale of Twitchell's fabric would "be subject to the terms and conditions specified in Schedule B attached hereto and made a part hereof." Schedule B was left blank at the time the Mechoshade EDA was executed, but the parties reached an agreement on its terms a little over a month later, and the completed Schedule B was executed in writing by Mechoshade's president. In contrast to the EDA, Schedule B provided that it would be governed by Pennsylvania law.

¶7      As we discuss in greater detail below, Schedule B significantly limited Mechoshade's potential remedies and Twitchell's potential liability for product defects. Schedule B provided, among other things, that Twitchell's liability for "any defective or nonconforming goods" "shall be limited to the replacement of, or at [Twitchell's] option, the refund of the price paid," and that Twitchell "shall have no obligation to replace or refund the purchase price of goods which have been cut or used in any way." Schedule B further provided that Twitchell "shall not be liable for consequential damages of any kind." Schedule B also contained other terms on other topics, including Mechoshade's liability for incidental damages and contractual interest, which we discuss as needed below. Springs does not meaningfully dispute that Schedule B was a binding and effective part of the EDA at the time it was executed.

¶8      As part of the course of dealing that developed between Mechoshade and Twitchell over the years, Mechoshade would issue purchase orders identifying the fabric it was purchasing, and Twitchell would provide written order acknowledgments. At least some if not all of these order acknowledgements contained language providing a limit on Twitchell's liability that was consistent with the limits set forth in Schedule B. Specifically, the order acknowledgments provided that Twitchell "will not, under any circumstances, be liable for any

special, indirect, or consequential damages (including, but not limited to[,] loss of profits) in any way related to its products, regardless of [the] legal or equitable theory on which the damages are sought."

¶9 Starting in 2015, Mechoshade began to experience problems with some of the fabric that Twitchell supplied. Specifically, Mechoshade received complaints that the window shades it manufactured for three projects were not hanging correctly due to issues with the fabric. Twitchell provided replacement fabric for the three projects, but it did not compensate Mechoshade for the various costs it incurred for manufacturing replacement shades, nor did it compensate Mechoshade for backcharges from Mechoshade's customers.

¶10 Springs entered the picture in 2015, when it acquired all of Mechoshade's stock through a purchase and sale agreement. Then, beginning in 2017, Springs began to purchase Twitchell's window shading product line on behalf of Mechoshade. Springs purchased the fabric by issuing purchase orders in its own name. Springs does not dispute that Twitchell sent order acknowledgments that contained the same limitation-of-liability language that we describe above.

¶11 Additionally, Springs and Twitchell also instituted a "stocking program," which allowed Springs to reduce its "lead time" and ensured that Twitchell would have certain frequently used fabrics on hand when Springs needed them. To that end, Springs would issue a "stocking purchase order" that directed Twitchell to keep certain quantities of fabric in inventory, and Twitchell would manufacture and hold the specified fabric to be shipped at Springs' request.

¶12 As with Mechoshade, Springs also began to experience problems with defects in some of the fabric that Twitchell supplied. Although Springs used

the defective fabric, the defects led to an "excessive amount" of waste, and Springs also incurred additional costs associated with labor, storage, and cleaning.

¶13 Then, in the spring of 2020, some of Springs' customers experienced construction slowdowns, which caused those customers to cancel orders that they had placed with Springs. At one point, Springs' supply chain manager contacted Twitchell and asked to cancel certain stocking purchase orders, and representatives from Twitchell responded to that request. The parties dispute the legal effect of this correspondence, which we discuss in greater detail below.

¶14 The relationship between Twitchell and Springs eventually broke down, and at some point, Springs stopped paying Twitchell's invoices for fabric that Springs had ordered and received. By August 2020, Springs had not paid 95 invoices that totaled approximately $1.15 million, which we refer to as "the unpaid invoices." Additionally, Twitchell was holding approximately $500,000 worth of inventory pursuant to the stocking program that had not yet shipped to Springs, and for which Springs had not yet paid. We refer to this manufactured and unshipped inventory as the "on-hand inventory."

¶15 In a letter that Twitchell's general counsel sent to Springs, Twitchell raised concerns about the unpaid invoices and on-hand inventory. Twitchell demanded payment by Springs of all amounts that were due on the unpaid invoices, and for Springs to "affirm its intention to make timely payment of all other amounts." Twitchell also demanded "written confirmation of Springs' intention to pay for any product as invoiced," and "assurance that Springs remains solvent and able to pay its obligations as they become due."

¶16 In response, Springs sent a letter stating that it was "solvent" and "able to satisfy all of its obligations as they become due." However, Springs

asserted, "Twitchell [was] not … entitled to any payments from Springs" because Springs had "incurred losses of at least" the amount that Twitchell sought based on "various defects and quality control issues associated with Twitchell's fabric."

¶17     Twitchell then filed this lawsuit, which alleges that Springs breached its contract with Twitchell in two ways: by failing to pay the unpaid invoices and by failing to pay for the on-hand inventory.[2]  Twitchell later specified that it was seeking $1,150,847.35 for the unpaid invoices; $497,705.44 for the purchase price of on-hand inventory; and $621,837.34 in costs it incurred to store the on-hand inventory.

¶18     Springs denied liability, and it eventually filed two counterclaims against Twitchell.  The first counterclaim had been assigned to Springs by Mechoshade, and alleged that Twitchell breached its contract with Mechoshade when it supplied defective fabric that was used in the three projects.  The second counterclaim alleged that Twitchell breached its contract with Springs when it supplied defective fabric in various unspecified orders.

¶19     Twitchell and Springs eventually filed cross-motions for summary judgment.  Twitchell argued that it was entitled to judgment on its claim and dismissal of the counterclaims.  For its part, Springs argued that it was entitled to judgment on its counterclaims and that Twitchell was not entitled to some of the damages it sought.  More specifically, Springs did not dispute that it was liable for the unpaid invoices.  However, Springs argued that it was not liable for at least

---

[2] The original complaint was filed in September 2020, and Twitchell later amended its complaint in August 2023.  As relevant to this appeal, the most prominent difference between the original and amended complaint is that the amended complaint alleges that the contractual relationship between Twitchell and Springs is governed by Schedule B.

some of the on-hand inventory because it had cancelled those orders, and that it also was not liable for incidental damages in the form of storage costs for the on-hand inventory. Additionally, Springs argued that any damages that Twitchell was entitled to should be offset by the damages Mechoshade and Springs incurred as a result of Twitchell's defective products.

¶20 A significant portion of the summary judgment briefing was devoted to the issue of the applicability of Schedule B. Twitchell argued that Schedule B governed its contractual relationships with Mechoshade and Springs alike, and that Schedule B's limited remedy and liability provisions barred Springs' attempt to recover the damages it was seeking. By contrast, Springs argued that Schedule B, which had at one point governed the contractual relationship between Twitchell and Mechoshade, had long since been abandoned, and that Schedule B had never governed the contractual relationship between Twitchell and Springs.

¶21 The circuit court granted summary judgment in Twitchell's favor and dismissed Springs' counterclaims. In so doing, the court resolved the dispute about Schedule B, reasoning that the undisputed facts showed that Schedule B governed Twitchell's contractual relationships with Mechoshade and Springs alike. With respect to Twitchell's contract claim against Springs, the court determined that Springs was liable for the unpaid invoices and for the on-hand inventory (although the court did not specifically address Springs' argument that it had cancelled some of the on-hand inventory). The court also determined that, pursuant to Schedule B, Springs was liable for the costs Twitchell incurred in storing the on-hand inventory. Finally, with respect to the counterclaims, the court noted, among other things, that Schedule B limited Twitchell's liability to

"replacement or credit for defective or non-conforming fabric," and that Springs was not seeking either remedy here.[3]

¶22 Twitchell filed a proposed judgment, and Springs objected to portions of that judgment. The circuit court entered judgment in Twitchell's favor. It awarded Twitchell all of its requested direct and incidental damages, as well as contractual and statutory interest. Springs appeals.

## DISCUSSION

¶23 Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." WIS. STAT. § 802.08(2) (2023-24);[4] *see also* **Green Spring Farms v. Kersten**, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). On appeal, "[w]e review an order for summary judgment de novo, using the same methodology as the circuit court." **Yahnke v. Carson**, 2000 WI 74, ¶10, 236 Wis. 2d 257, 613 N.W.2d 102.

---

[3] The circuit court also determined that it would apply Pennsylvania law and its four-year statute of limitations to Springs' first counterclaim, which sought damages associated with the product Twitchell supplied to Mechoshade. We do not further address the parties' disputes about the pertinent statute of limitations because, we conclude, both counterclaims fail as a matter of law on other grounds. *See* **Maryland Arms Ltd. P'ship v. Connell**, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("Typically, an appellate court should decide cases on the narrowest possible grounds.").

[4] All references to the Wisconsin Statutes are to the 2023-24 version.

## I. Schedule B

¶24      Here, as discussed, this case concerns contractual disputes between Twitchell, on the one hand, and Mechoshade and Springs on the other.  As the circuit court recognized, resolution of the cross-motions for summary judgment turns in large part on the determination of whether the Mechoshade EDA, and in particular its Schedule B, govern the contractual relationships at issue here.  This is so because Schedule B unambiguously set forth the remedies available to the seller and buyer in the event of a breach of contract and, if applicable, these remedies establish the contractual parameters for our analysis of the claim and counterclaims.

¶25      We therefore begin by considering the threshold questions regarding Schedule B's applicability—first to Twitchell's contractual relationship with Mechoshade, and then to Twitchell's contractual relationship with Springs. Before proceeding with that analysis, we briefly comment on the choice-of-law issues raised in this case.  As noted, by its express terms, the Mechoshade EDA is governed by New York law; but Schedule B, which is part of the Mechoshade EDA, is governed by Pennsylvania law.[5]  These differing choice-of-law provisions could present complex choice-of-law issues under different facts, but not here.  As to matters of procedure, we apply Wisconsin law because Wisconsin is the forum

---

[5] *See **American Fam. Mut. Ins. Co. v. Cintas Corp. No. 2***, 2018 WI 81, ¶13, 383 Wis. 2d 63, 914 N.W.2d 76 (2018) ("There is no doubt that, generally speaking, parties are free to choose the law governing their contracts."); WIS. STAT. § 401.301 (providing that, "when a transaction bears a reasonable relation to this state and to another state or nation[,] the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties").

state.[6]  As for the substantive contract law issues that are dispositive here, the parties do not identify any material differences between the laws of New York and Pennsylvania, and we therefore give effect to the overlapping contract law of both states in the discussion that follows.  *See Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15.

## A.  Twitchell and Mechoshade

¶26    Twitchell and Mechoshade formed a contract in 1989 when both parties agreed to the Mechoshade EDA and manifested their mutual assent by signing it.  *See Stonehill Capital Mgt. LLC v. Bank of the W.*, 68 N.E.3d 683, 689 (N.Y. 2016) ("To form a binding contract, there must be 'a meeting of the minds' … such that there is 'a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" (citation omitted)); *see also Jenkins v. County of Schuylkill*, 658 A.2d 380, 383 (Pa. Super. Ct. 1995) (same).  Although Schedule B was left blank at the time the Mechoshade EDA was executed, it is undisputed that Twitchell and Mechoshade agreed to and finalized all of its material terms shortly thereafter.  *See JER Realty, LLC v. Pick & Pack Hub, LLC*, 236 A.D.3d 1004, 1006 (N.Y. App. Div. 2025) (parties can modify a contract the same way any other contract is established, through a meeting of the minds and "a mutual assent to [the] terms"); *see also Matevish v. School Dist. of Borough of Ramey*, 74 A.2d 797, 800 (Pa. Super. Ct. 1950) (same).

---

[6] *See Marten Transp. v. Rural Mut. Ins. Co.*, 198 Wis. 2d 738, 745, 543 N.W.2d 541 (1995) ("The general rule … is that the law of the forum, that is, the law of the place where relief is sought, governs matters of procedure.").

¶27 Mechoshade's assent to the agreement is evidenced by a signed letter from Joel Berman, who was president of Mechoshade at the time the Mechoshade EDA and Schedule B were negotiated, and who expressly agreed to Schedule B's terms. It is undisputed that the letter is authentic and that Joel Berman had authority to enter binding contracts on Mechoshade's behalf. Thus, there is no genuine dispute of fact that Schedule B became a valid and enforceable part of the Mechoshade EDA.

¶28 Springs nevertheless makes several related arguments in support of the proposition that Schedule B does not govern the current dispute between Twitchell and Mechoshade. For reasons we now explain, none of these arguments are persuasive.

¶29 Springs first contends that there is "overwhelming evidence" that neither Twitchell nor Mechoshade were aware of the existence of the finalized Schedule B. In making this argument, Spring overlooks the signed letter by Joel Berman, which acknowledged Schedule B's existence and expressly bound Mechoshade to it terms. Springs instead relies primarily on the deposition testimony from Jeff Register and Jan Berman, who were the respective presidents of Twitchell and Mechoshade years later, when the disputes over the quality of Twitchell's fabric arose. Register and Berman testified that they had never seen Schedule B, and Register testified that he thought that it did not exist. On this basis, Springs argues that Twitchell and Mechoshade "did not know Schedule B existed" and "could [not] act pursuant to Schedule B's terms" at the time the transactions at issue here occurred.

¶30 We do not agree that this deposition testimony raises a genuine dispute about Schedule B's applicability to this dispute. Generally speaking, a

contracting party's ignorance of contract terms does not relieve the party of their application. *See, e.g.*, **Simeone v. Simeone**, 581 A.2d 162, 165 (Pa. 1990) (contracting parties are "bound by their agreements, without regard to whether the terms thereof were read and fully understood ..."); *see also* **Metzger v. Aetna Ins. Co.**, 125 N.E. 814, 816 (N.Y. 1920) (a contracting party is "presumed" to know a contract's contents). Springs does not point to any legal authority to support the proposition that companies may be excused from their contractual agreements based on the ignorance of certain terms by company executives. *See* **State v. Pettit**, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (a court need not consider arguments that are otherwise undeveloped). Thus, even if the current executives of Twitchell and Mechoshade were unaware of Schedule B's existence, that does not raise a genuine dispute about its applicability.

¶31 Springs next contends that Mechoshade's purchase orders, rather than Schedule B, are the pertinent contracts between Twitchell and Mechoshade. The purchase orders Springs references contain limited information about the type and quantity of fabric that Mechoshade was ordering, shipment details, and payment due date; and, as mentioned, Twitchell acknowledged the purchase orders with order acknowledgements that expressly limited Twitchell's liability for consequential damages. We assume that Mechoshade's purchase orders (along with Twitchell's order acknowledgments) are valid and binding contracts. However, it does not follow that the contracts formed by purchase orders and order acknowledgements displace Schedule B, which was another binding contract that established the generally applicable terms of the contracting relationship between Twitchell and Mechoshade. *See* **Q-Dot, Inc. v. Atlantic City Elec. Co.**, 432 A.2d 1098, 1099-1101 (Pa. Super. Ct. 1981) (purchase orders were contracts that "authorized[ed] [the] appellant to undertake certain work," and were subject

to a master agreement, which established the "general set of terms and conditions" between the parties and unambiguously prohibited the appellant from undertaking certain actions); *Liptis Pharms. USA, Inc. v. Liptis for Pharms. & Med. Prods.*, 215 N.Y.S.3d 121, 122-23 (N.Y. App. Div. 2024) (dismissing a counterclaim that was based on an alleged breach of terms in a purchase order because there was a master agreement that unambiguously provided the terms of sale that governed the dispute).

¶32    Springs also contends that, even if Schedule B governed the relationship between Twitchell and Mechoshade at some point, it was modified by the course of performance between those parties.  Specifically, Springs points to evidence that Twitchell sometimes allowed Mechoshade to reject fabric for reasons not contemplated by Schedule B and beyond the deadlines set by Schedule B.  Springs also points out that Twitchell sometimes sent replacement fabric beyond the circumstances contemplated in Schedule B.  Springs therefore contends that there is a genuine dispute as to whether the terms in Schedule B were modified by the contracting parties' performance.

¶33    This argument fails for two reasons.  First, Schedule B explicitly provides that "[n]o waiver, alteration or modification of the foregoing provisions [of Schedule B] shall be valid unless made in writing and signed by [Twitchell]," and Springs does not identify any such writing.  Second, although Springs accurately points out that a course of performance can, under certain circumstances, defeat a written-modification provision such as the one in Schedule B, a course of performance will alter only those contract terms that are "inconsistent with the course of performance."  *See* 13 PA. CONS. STAT. § 1303(f)

(2024).[7]  Here, there is no inconsistency between the course of performance that Springs outlines and the dispositive terms in Schedule B, which identify the remedies that Twitchell and Mechoshade would be entitled to in the event of a breach.  Accordingly, even if the parties' actions modified or waived some of the terms in Schedule B that address Mechoshade's rights with respect to rejecting fabric or the availability of replacement fabric, it did not waive the pertinent terms that control this dispute.

### B.  Springs and Twitchell

¶34    We now consider whether Schedule B governs the transactions that occurred between Springs and Twitchell.  As mentioned, Springs acquired Mechoshade in 2015 and, beginning in 2017, Springs began to place its own orders with Twitchell.  According to the pleadings that Springs filed in this case, its interrogatory responses, and the deposition of its corporate representative, Springs placed these orders "on behalf of Mechoshade."

¶35    Springs nevertheless argues that there is a genuine dispute of fact as to whether these orders were governed by the same set of contracts (namely the Mechoshade EDA and its Schedule B) that govern the contractual arrangement between Twitchell and Mechoshade.  Springs argues that these contracts do not govern its relationship with Twitchell because Springs was not a signatory to the Mechoshade EDA, and "[b]asic principles of corporate law" provide that "a parent corporation … is not normally liable for the … contractual obligations of a subsidiary … simply because the parent wholly owns the subsidiary."

---

[7]  All references to the Pennsylvania Consolidated Statutes are to the 2024 version.

¶36     But this argument is not directly on point.  The question here is not whether Springs is liable for any breach of the EDA by Mechoshade, and indeed, there is no allegation that Mechoshade breached the EDA.  The question is instead whether the purchase orders that Springs undisputedly placed on behalf of Mechoshade are governed by the same terms and conditions as the contracting relationship between Twitchell and Mechoshade.  *See* ***Humphrey v. GlaxosmithKline PLC***, 263 A.3d 8, 17 (Pa. Super. Ct. 2021) (under Pennsylvania law, a non-signatory might be bound to a contract through "common law principles" such as "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel"); ***Amkor Tech., Inc. v. Alcatel Bus. Sys.***, 278 F. Supp. 2d 519, 521-23 (E.D. Pa. 2003) (determining that a non-signatory was bound to an arbitration term in a contract because the non-signatory used the contract to receive "the direct benefit" of certain terms, and "a non-signatory should not be permitted to embrace a contract for some purposes and then disclaim that same contract's unfavorable terms"); *see also* ***Jennings v. Hunt Cos.***, 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019) (citation omitted) (interpreting New York law, and stating that the terms and conditions of a subsidiary's contract can govern a non-signatory parent company if the parent company's "conduct manifests an intent" to be bound to the contract, and that courts can infer such an intent when the parent company "is in privity with the [subsidiary] or has assumed the obligations of the contract").

¶37     Here, the undisputed facts show that Springs assumed Mechoshade's rights and obligations under the Mechoshade EDA.  It is undisputed that Springs placed orders on behalf of Mechoshade, and that Springs received and inspected the fabric it had ordered, paid for some of the orders, and received credit for other orders.  Given that the Mechoshade EDA prohibited Twitchell from selling its

fabric line to any entity in North America except Mechoshade, the only way that Springs could have ordered Twitchell's fabric is if it did so pursuant to Mechoshade's rights and obligations under the Mechoshade EDA. And, by assuming those rights and obligations, Springs also assumed the terms and conditions of that contractual relationship, which included those set forth in Schedule B.[8]

## II. Twitchell's Breach of Contract Claim

¶38 Having determined that Schedule B governs the contractual relationships at issue here, we now turn to the grant of summary judgment in Twitchell's favor on its breach of contract claim against Springs. As noted, the circuit court determined that Springs is liable for the unpaid invoices, on-hand inventory, and storage costs, and it awarded Twitchell direct and incidental damages in the amounts itemized in Twitchell's summary judgment briefing, plus contractual and statutory interest. We address Springs' liability for the unpaid invoices, the on-hand inventory, and the storage costs in turn, and we then address Springs' arguments about the damages amounts.

---

[8] In a footnote to its appellant's brief, Springs also asserts that Schedule B no longer governs the relationship between Twitchell and Springs because "Mechoshade terminated the EDAs as of June 1, 2019, and any [purchase orders] after that date could not have been subject to Schedule B." In its respondent's brief, Twitchell contends that Springs purported to terminate the exclusive distributorship agreement with Joel Berman Associates, but it did not ever attempt to terminate the Mechoshade EDA. We need not and do not address Springs' assertion that it terminated the Mechoshade EDA because Springs does not cite any record support for that assertion on appeal, and it acknowledges that it did not develop any such argument in the circuit court. *See* **Roy v. St. Lukes Med. Ctr.**, 2007 WI App 218, ¶10 n.1, 305 Wis. 2d 658, 741 N.W.2d 256 (appellate courts "have no duty to scour the record to review arguments unaccompanied by adequate record citation"); **Greene v. Hahn**, 2004 WI App 214, ¶21, 277 Wis. 2d 473, 689 N.W.2d 657 ("we will not address an issue that an appellant raises for the first time on appeal").

## A.  The Unpaid Invoices

¶39    Springs does not expressly dispute its liability for the unpaid invoices.  As to these invoices, it is undisputed that Springs sent Twitchell purchase orders for the invoiced fabric between 2018 and 2020; that Twitchell manufactured the fabric that Springs ordered; that Springs used the fabric; and that Springs did not pay Twitchell's invoices for those orders.  Springs does not make any argument about the unpaid invoices on appeal, and we take Springs' failure to respond to Twitchell's argument on this topic as a tacit concession that the circuit court correctly granted summary judgment with respect to these invoices.  *See Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994) (a proposition asserted by respondent on appeal and not disputed by the appellant's reply brief is deemed conceded).  Therefore, we affirm the portion of the judgment that awards damages for the unpaid invoices.

## B.  Payment for the On-Hand Inventory

¶40    Springs argues that the circuit court erroneously determined that Springs is liable for the purchase price of the on-hand inventory.  As discussed, the on-hand inventory was manufactured as part of the stocking program—Springs would issue stocking orders that directed Twitchell to manufacture certain high-demand fabrics; Twitchell would manufacture and store that inventory; and it would be available and ready to ship at Springs' request.  Here, it is undisputed that Twitchell holds $497,705.44 worth of on-hand inventory that it manufactured at Springs' request, and it is also undisputed that Springs has not received or paid for that inventory.

¶41    Springs argues that there is a genuine dispute of fact with respect to its liability for this inventory because there are emails in the record showing that

Springs cancelled some of the on-hand inventory items. One of the stocking orders for which Twitchell seeks payment is order 1042526, and the emails that Springs directs us to show that Springs requested cancellation of several items in that order and that Twitchell responded favorably to the request. As we now explain, considering the emails in the light most favorable to Springs, there is a genuine dispute of fact about Springs' liability for some of the inventory that was the subject of stocking order 1042526. However, Springs' argument does not apply to the remaining stocking orders on which Twitchell seeks to collect—that is, there is no genuine dispute of fact as to stocking orders 1199615, 1216853, 1225835, 1230154, 1230196, 1233226, 1233224, 1239018, 1243047, and 1247204, and we affirm the grant of summary judgment as to those stocking orders.[9]

¶42     The pertinent facts about stocking order 1042526 are as follows. The stocking order, dated May 17, 2018, directed Twitchell to manufacture and hold approximately $1.5 million worth of fabric as part of the stocking program. It appears that Springs received and paid for some but not all of this fabric over the next two years. Then, in the early days of the pandemic, Patrick Moore, who was a senior buyer for Springs, sent an email to Twitchell's customer service representative, Lorey Heath, seeking to "cancel" certain items from the stocking

---

[9] To the extent that Springs argues that there is also a genuine dispute of fact with respect to stocking order 1230154, we disagree. In its appellate briefing, Springs appears to suggest that Twitchell also approved cancellation of at least some of order 1230154. However, Springs does not point us to anything in the record that supports that assertion. To the contrary, the record appears to show that Springs asked to cancel some of order 1230154 and that Twitchell denied that request.

Springs also makes arguments about three other stocking orders that it purportedly cancelled (1219737, 1228134, and 1243048), but Twitchell's summary judgment materials show that it was not seeking to hold Springs liable for those orders.

order "and move back to the standard [purchase order] method." Initially, Heath responded by approving portions of Moore's request "where possible," but also stated that "not all requests were possible to approve, dependent on how far along the order was in process." Springs' supply chain manager, Ryan Swanson, intervened in the email chain, stating that Springs "[did] not have a choice but to cancel the items that have not shipped," and that Springs needed "to eliminate as much [purchase order] liability as possible in the short term. Our demand has fallen and our customers are refusing to pay." Heath replied to this last email by stating: "approval received to cancel [the] remainder of the attached spreadsheets as per your request."[10]

¶43 Twitchell argues that this email correspondence fails to raise a genuine dispute of fact because, it contends, the emails show only that *shipment* of certain items in order 1042526 was cancelled—according to Twitchell, there can be no dispute that Springs is still liable for the *purchase price*. We are not persuaded. To be sure, the emails, which also refer to contemporaneous phone calls between Moore, Heath, and Swanson, are somewhat ambiguous as to the effect of Twitchell's approval of Springs' cancellation request. However, construing these facts in the light most favorable to Springs, a reasonable factfinder could conclude that Springs intended to cancel its obligation to pay for certain items in order 1042526; that Twitchell understood that to be Springs' intent; and that Twitchell approved Springs' request with the understanding that Springs would not be liable for the cancelled items in that order.

---

[10] We observe that it is not clear from the record whether all of the spreadsheets referred to in this email chain were included in the summary judgment record.

¶44 Accordingly, we reverse the grant of summary judgment as to order 1042526 and remand for further proceedings regarding Springs' liability for any unshipped items in that order and the damages, if any, to which Twitchell is entitled for that order. We observe that the proceedings on remand may result in changes to three different aspects of the damages calculation set forth in the judgment—the calculation of Twitchell's direct damages for the on-hand inventory, the calculation of Twitchell's storage costs for the on-hand inventory, and the calculation of interest on those two items of damages.

## C. Storage of the On-Hand Inventory

¶45 Springs next disputes its liability for the incidental damages that Twitchell incurred in the form of storage costs. As discussed, it is undisputed that Twitchell stopped delivering on-hand inventory to Springs after Springs failed to provide adequate assurances that it would pay the purchase price of that inventory. Twitchell contends that it had to rent a warehouse to store the on-hand inventory and has incurred $621,837.34 in rental and utility costs, which it now seeks to collect in incidental damages.

¶46 The parties do not dispute that Schedule B allows Twitchell to collect incidental damages. Schedule B provides that Twitchell "shall have all remedies of a seller under the Uniform Commercial Code," and the Uniform Commercial Code provides that sellers can recover incidental damages. *See* U.C.C. §§ 2-709, 2-710; 13 PA. CONS. STAT. § 2709(a). Accordingly, based on the unambiguous language in the parties' contract, Twitchell is entitled to collect incidental damages associated with Springs' breach, which, here, includes the costs that Twitchell incurred in storing the on-hand inventory.

21

¶47     Despite the language in Schedule B, Springs argues that it is not liable for incidental damages because there is "undisputed evidence" in the record that "Twitchell never told Springs it was storing this fabric until February 2024 when Twitchell disclosed it during discovery" in this litigation, which "deprived [Springs of] any opportunity to make other arrangements and minimize costs." This argument does not raise a genuine dispute of fact with respect to Springs' liability, given that Springs does not cite to any authority to support the proposition that a buyer's lack of knowledge of the costs a seller incurs prevents the seller from collecting incidental damages. *See Pettit*, 171 Wis. 2d at 646 ("Arguments unsupported by references to legal authority will not be considered.").[11]

¶48     Springs also makes other miscellaneous arguments with respect to the storage costs, all of which are raised for the first time on appeal.[12]  By not raising these issues in the circuit court, Springs has forfeited the opportunity to raise them here. *Shadley v. Lloyds of London*, 2009 WI App 165, ¶25, 322 Wis. 2d 189, 776 N.W.2d 838 (under the forfeiture rule, "issues not presented to the

---

[11] To the extent that Springs actually means to make an argument about Twitchell's failure to mitigate its damages, Springs has forfeited any such argument by failing to raise it with specificity in the circuit court. *See Schill v. Wisconsin Rapids Sch. Dist.*, 2010 WI 86, ¶45 & n.21, 327 Wis. 2d 572, 786 N.W.2d 177 (when a party fails to specifically raise an issue before the circuit court in a manner that allows the court to address the issue and correct any potential error, the party forfeits that issue on appeal).  Although it is true that Springs' summary judgment briefing referenced Twitchell's failure to notify it of the storage costs, Springs did not argue that Twitchell failed to mitigate its damages.  This is fatal to any such claim, given that mitigation is an affirmative defense for which Springs would bear the burden of proof.  *See Lobermeir v. General Tel. Co.*, 119 Wis. 2d 129, 148, 349 N.W.2d 466 (1984); *Love v. Love*, 33 A.3d 1268, 1278 (Pa. Super. Ct. 2011).

[12] Specifically, Springs now asserts that there is a dispute of fact as to whether it provided "adequate assurance[s]" of payment and whether "Twitchell [was] storing more than just the on-hand inventory from cancelled orders in the warehouse it … rent[ed]."

[circuit] court will not be considered for the first time at the appellate level"). Springs does not make an argument that we should overlook the forfeiture rule in this instance; accordingly, we do not discuss Springs' miscellaneous arguments further.

## D. Damages

¶49 Finally, Springs argues that the circuit court erred with respect to its award of damages and interest. Springs' appellate briefing on this topic is difficult to follow, but as best we understand it, Springs appears to be making two discrete arguments, which we address in turn.

¶50 First, Springs asserts, there are genuine disputes about the amount of damages Twitchell incurred, and the circuit court erred by awarding those damages without holding a hearing. This argument is unfounded. Twitchell's memorandum in support of summary judgment set forth all damages amounts with specificity and supporting evidence. Apart from the cancellation argument that we address above, Springs' response to Twitchell's memorandum did not provide contrary evidence or dispute Twitchell's calculation. Therefore, apart from the issues regarding stocking order 1042526, Springs failed to raise any genuine dispute regarding the damages amount, and the court was not required to hold a hearing to address undisputed items of damages.

¶51 Second, Springs asserts, the circuit court did not provide a legal basis for awarding 18% post-judgment interest on the direct damages and 6% post-judgment interest on the incidental damages, rather than post-judgment interest at the Wisconsin statutory rate. *See* WIS. STAT. § 814.04(4). But the legal basis is evident. Under Pennsylvania law, "[t]he statutory rate of [post-judgment] interest … is fixed at 6%, but parties to a contract may agree to a higher rate." *Pittsburgh*

*Constr. Co. v. Griffith*, 834 A.2d 572, 591 (Pa. Super. Ct. 2003). Here, Schedule B does not provide an interest rate for incidental damages, but it does provide that Twitchell is entitled to 18% interest on "overdue bills" and certain "deliverable" goods for which shipment has been deferred. Springs did not identify any error in this reasoning during the circuit court proceedings, nor does it identify any such error on appeal.

### III. Springs' Counterclaims for Breach of Contract

¶52    We now turn to Springs' counterclaims for breach of contract, which are easily resolved by our conclusion about Schedule B.

¶53    As stated, Springs' first counterclaim relates to defective fabric that Twitchell supplied in response to purchase orders from Mechoshade. Specifically, Springs seeks to recover Mechoshade's monetary damages in the form of customer backcharges and the costs Mechoshade incurred to manufacture replacement shades for three projects.

¶54    This counterclaim is unambiguously precluded by the limitation on liability provision in Schedule B. Schedule B provides that Twitchell's liability "for defective or nonconforming goods" "shall be limited to the replacement of, or at [Twitchell's] option, the refund of the price paid for [the goods]." It is undisputed that Twitchell supplied Mechoshade with replacement fabric for all three projects, and therefore, Mechoshade has already received the sole remedy available to it under Schedule B.

¶55    Springs' second counterclaim relates to defective fabric that Twitchell supplied in response to purchase orders from Springs. Springs seeks to recover monetary damages for an excessive amount of wasted fabric, as well as

costs associated with labor, storage, and cleaning to address the issues with the fabric. This counterclaim is likewise barred by the limitation of liability provision in Schedule B, as well as by the provision stating that Twitchell "shall have no obligation to replace or refund the purchase price of goods which have been cut or used in any way." It is undisputed that Springs cut and used the fabric that it received from Twitchell; accordingly, this provision of Schedule B likewise prohibits recovery.

¶56 Springs nevertheless argues that a trial on its counterclaims is necessary because there is "sufficient evidence for a jury to conclude" that the limited remedy provision in Schedule B failed "of its essential purpose." We are not persuaded.

¶57 Contracting parties are generally permitted to agree to limit the measures of damages available to a buyer to "return of the goods and repayment of the price or to repair and replacement of nonconforming good or parts." 13 PA. CONS. STAT. § 2719(a)(1). Such provisions are enforceable unless "circumstances cause [it] to fail of its essential purpose." 13 PA. CONS. STAT. § 2719(b). A remedy fails of its essential purpose if it deprives one party "of the substantial value of the bargain." *Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 262 (Pa. Super. Ct. 1997). "There are … relatively few situations where a remedy can fail of its essential purpose," and it occurs "most often in cases … when the exclusive remedy involves replacement or repair of defective parts, and the seller[,] because of his negligence in repair or because the goods are beyond repair, is unable to put the goods in warranted condition." *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 929 (Pa. Super. Ct. 1989) (citation omitted).

¶58 Although it is true that the remedy in Schedule B is almost exclusively replacement, the undisputed facts show that it did not "fail of its essential purpose." Here, it is undisputed that Mechoshade and Springs were able to use the replacement fabric to manufacture shades that they sold to their customers. Although Springs contends that some of the replacement fabric that Twitchell provided to Mechoshade for one specific project also turned out to be defective, Springs does not point to anything in the record to suggest that this occurred because Twitchell was negligent in remedying the fabric. *New York State Elec. & Gas Corp.*, 564 A.2d at 929 (a seller's "negligence in repair" can make a replacement remedy fail of its "essential purpose"). Nor was the replacement fabric that Twitchell provided "beyond repair," given that it is undisputed that Mechoshade accepted the replacement fabric for the project, manufactured it into window shades, and installed those shades. *See* *id.* Therefore, we conclude that there is no genuine dispute that the limited remedy provision in Schedule B did not fail of its essential purpose.

## CONCLUSION

¶59 For the reasons explained above, we reverse the portion of the judgment that grants summary judgment to Twitchell on its claim for breach of contract with respect to order 1042526 and the damages that are associated with that order. We affirm the remainder of the judgment in all respects.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.